UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH STANLEY DURAN, III,

Petitioner,

v.

R.T.C. GROUNDS,

Respondent.

No.  2:14-cv-0094 JAM GGH P

ORDER and FINDINGS AND
RECOMMENDATIONS

*Introduction and Summary*

Petitioner's defense to a murder and attempted murder charge was a common one—the other guy did it.  And the societal circles in which petitioner was placed, or found himself, made such a defense all the more possible.  Ostensibly to avenge himself for being on the losing end of a fight, or on his way to a drug deal, or just along for the ride, petitioner was in a car with persons with criminal backgrounds—persons whose involvement in a shooting from a vehicle would not have been shocking.  Indeed, petitioner paints the driver of the vehicle, if he was driving, as a person with mental difficulties portending violence and one with a potential motive (his sister was involved in a fracas with one of the group shot at).  All of the claims in this petition revolve around rulings of the trial court, or actions by petitioner's trial counsel, which are posited as harmful to petitioner's defense.

1

1    However, the focus of this petition is, for the most part, on the California Court of Appeal,

2 which issued a reasoned decision on all but two claims.  Petitioner cannot overcome the deference

3 which is given to the state courts; that is, petitioner has not shown that the appellate court was

4 AEDPA unreasonable in applying clearly established Supreme Court law to the issues.  In

5 addition, petitioner cannot demonstrate that he suffered sufficient prejudice as a result of asserted

6 suppression of a witness' criminal history, or his counsel's failure to exploit a witness' criminal

7 history for impeachment purposes.

8    *Factual Background*

9    The background to this case is well stated by the Court of Appeal:

> It is not necessary to recount every detail of the trial record because much of it is repetitive, cumulative, or not particularly germane to the contentions defendant advances on his appeal. The Attorney General commences her brief with an admirably concise thumbnail précis of this case: "On June 20, 2007, appellant, a passenger in a van, discharged a firearm at a parked Cadillac as he drove by. Two bullets struck and killed Angelo Hurst, who was standing next to the Cadillac. The prosecution theory was that appellant intended to kill Brandon Boyd, who was a passenger in the Cadillac, in retaliation for Boyd's attack on him earlier that day. The defense claimed mistaken identity ... that Tereaun Berry, the driver of the van, committed the shooting."

> This is one of those cases where just about everyone knows everybody else. Defendant knew Boyd, and they had been friends. Defendant was also a friend of Maria and Xavier Montano, Kevin Davis, and James Ayres. Defendant knew Tereaun Berry and his sister Tecora.

> But by the date of the killing, June 20, defendant's friendship with Boyd was a thing of the past. That day, they had a brief fight. There were no serious injuries, but defendant got the worst of it, and he wanted a rematch. Boyd learned of defendant's desire but had no intention of indulging it.

> It was apparently still up in the air whether there would be a Round Two between defendant and Boyd when the Montanos picked up Boyd and Ayers in their Cadillac. Boyd sat behind Xavier, who was driving. They parked on Cambridge Drive in Vacaville. At approximately 9:45 p.m., Hurst and Davis were standing next to the vehicle, conversing with the four occupants, when a dark–colored van approached. A fusillade of shots was fired from the van.

27   / / /

28   / / /

2

The van belonged to Tereaun Berry's mother. Tereaun had picked up his sister Tecora at her place of work, together with Sontoya Hawkins, a coworker who needed a ride home. Then they picked up defendant. Tecora (who was chastised by the trial court as "the most contemptuous witness I've ever seen in 32 years ... in the legal profession") testified in effect that "[w]e was driving around Vacaville," past "a car with some people standing outside" when defendant started shooting, but otherwise "I don't remember all the details [as] to what happened that night" except that the next thing she knew they were dropping off Hawkins. It appears Hawkins went into hysterics when the shooting began, so she was similarly unforthcoming with details. However, during a subsequent police interview, Hawkins identified Terraun's "friend," who "they call Joe" and who was sitting in the front passenger seat, as the person who fired the shots.

As for Tereaun Berry (who was even more recalcitrant than his sister and was actually held in contempt after being warned against lying),[N.1] he testified that defendant called and asked for a ride. When defendant got in the van, his face was bruised and he told Tereaun he had been in a fight with Boyd. Tereaun himself had "no beef" with either Boyd or Davis. He did not know that defendant was armed.[N.2]

> [N.1] At the start of the defense's cross–examination, Tereaun announced: "I don't want to be here. I told them people ... that I am a schizophrentic [sic ]. I am bipolar. My doctor wrote them a—a statement. I ain't credible, I can't testify, and they still went ahead and do what they want to do to me.... [¶] I ain't took my medication in hella long because I ran out, and I ain't be going back and see my doctor in like two or three months, but my letter I got, it's like four months out, but it's good."

> [N.2] There was a gun in the van, put there by a family member Tereaun refused to name, but it may not have been the gun defendant used in the shooting, or the one defendant took with him afterwards.

To hear Tereaun tell it, he was simply driving along when the firing suddenly started.  Asked if he saw defendant "put his arm out of the window and start shooting," Tereaun replied "[i]t might have happened." Tereaun grudgingly testified that the firing was directed at a group, some of whom he recognized. After the shooting, Tereaun dropped off Hawkins in Suisun and defendant in Fairfield. Defendant took the gun with him. Defendant told Tereaun that "those people they deserved it," but he was sorry to have used "your mom's car."[N.3] "Maybe" defendant called afterwards and asked Tereaun "not to tell." Thereafter Tereaun did receive threats, although he did not know if they originated with defendant.

///

///

3

[N.3] The apology may have been motivated by Hawkins reproaching defendant for possibly endangering Tereaun's and Tecora's mother if "these people" connected her vehicle to the shooting.

It was not until the very end of Tereaun's cross-examination that a very salient detail emerged, namely, that the van did not arrive at the shooting scene by happenstance, but Tereaun intentionally drove there at defendant's direction so that defendant could "do a drug deal."

Three days after the shooting, Tereaun was voluntarily interviewed by Vacaville Detective Kellis and identified defendant as the shooter. According to Detective Kellis, Tereaun had no difficulty in recounting a version more detailed than his trial testimony. After being picked up, defendant directed Tereaun to the location where defendant "was going to do a ... drug deal." As his van approached the Montanos' Cadillac, Tereaun recognized the victim, Angelo Hurst, Boyd, and Kevin Davis. Defendant "made a statement to the effect of there they are," followed by cocking his firearm. Defendant then said "Fuck that shit," and began firing. While being driven back to Fairfield, defendant told Tereaun "they deserved what they got." Tereaun recounted that the day after the shooting he received the first "threat towards his family" from defendant.

The same thing occurred with respect to Tecora. Vacaville Police Officer Carey interviewed Tecora on the night of the shooting, at which time she told him what happened with "great detail." She corroborated the essence of the version Tereaun gave to Detective Kellis about defendant's "there they are" statement, followed by the cocking of the gun, the "fuck this" comment, and then the firing, and how "they were all upset with Joe" and "freaking out." And like Tereaun, Tecora identified defendant in a photographic line–up.

Hurst was hit in the back. Montano inside his car was hit in the leg. Defendant immediately fled to Mexico, where he was arrested and returned for trial in 2008.

Defendant did not testify. The sole witness on his behalf was Tereaun's psychiatrist, who testified that she diagnosed Tereaun as having "schizophrenia—paranoid type" and "impulse control disorder," and that he had "these mental health issues ... in June of 2007." Tereaun also suffers from delusions. On cross-examination, the doctor further testified in effect that Tereaun wanted to avoid testifying because he feared for his life.

People v. Duran, 2012 WL 5378286, at **1–3 (November 2, 2012)

/ / /

/ / /

/ / /

4

*Issues*

Petitioner challenges his conviction on the following grounds: (1) violation of his due process right to present a defense by the exclusion of third-party culpability evidence; (2) violation of his due process right to a fair trial when the trial court failed to give accomplice liability instructions; (3) ineffective assistance of counsel for failing to object to the prosecutor's vouching of the police officer's testimony; (4) ineffective assistance of counsel for failing to object to hearsay testimony; (5) the prosecution suppressed of impeaching evidence; (6) ineffective assistance of counsel for failing to impeach key witnesses; and (7) cumulative error.

*AEDPA Standards*

The AEDPA standards do play an important role in this case.  They are as follows. The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (2011).  Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 784–785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).

1    "The presumption may be overcome when there is reason to think some other explanation for the

2    state court's decision is more likely." Id. at 785.

3        The Supreme Court has set forth the operative standard for federal habeas review of state

4    court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable*

5    application of federal law is different from an *incorrect* application of federal law.'"  Harrington,

6    131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000).  "A state

7    court's determination that a claim lacks merit precludes federal habeas relief so long as

8    'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786,

9    citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

10        Accordingly, "a habeas court must determine what arguments or theories supported or . . .

11   could have supported[] the state court's decision; and then it must ask whether it is possible

12   fairminded jurists could disagree that those arguments or theories are inconsistent with the

13   holding in a prior decision of this Court."  Id.  "Evaluating whether a rule application was

14   unreasonable requires considering the rule's specificity.  The more general the rule, the more

15   leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.  Emphasizing the

16   stringency of this standard, which "stops short of imposing a complete bar of federal court

17   relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

18   cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

19   was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

20        The undersigned also finds that the same deference is paid to the factual determinations of

21   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

22   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

23   decision that was based on an unreasonable determination of the facts in light of the evidence

24   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

25   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – *i.e.*, the

26   factual error must be so apparent that "fairminded jurists" examining the same record could not

27   abide by the state court factual determination.  A petitioner must show clearly and convincingly

28   that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct.

6

1   969, 974 (2006).

2   The habeas corpus petitioner bears the burden of demonstrating the objectively

3   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

4   Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

5   show that the state court's ruling on the claim being presented in federal court was so lacking in

6   justification that there was an error well understood and comprehended in existing law beyond

7   any possibility for fairminded disagreement."  Harrington, 131 S.Ct. at 786–87.  "Clearly

8   established" law is law that has been "squarely addressed" by the United States Supreme Court.

9   Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

10  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

11  Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653–54 (2006) (established law not permitting state-

12  sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

13  prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

14  established law when spectators' conduct is the alleged cause of bias injection).  The established

15  Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

16  controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

17  federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

18  The state courts need not have cited to federal authority, or even have indicated awareness

19  of federal authority in arriving at their decision.  Early, 537 U.S. at 8, 123 S.Ct. at 365.  Where

20  the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

21  federal court will independently review the record in adjudication of that issue.  "Independent

22  review of the record is not de novo review of the constitutional issue, but rather, the only method

23  by which we can determine whether a silent state court decision is objectively unreasonable."

24  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

25  Finally, if the state courts have not adjudicated the merits of the federal issue, no

26  AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law.

27  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).  However, when a state court decision on a

28  petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

7

1   habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

2   merits.  Johnson v. Williams, ___ U.S. ___, 133 S.Ct. 1088, 1091 (2013).

3   *Discussion*

4       A.  Exclusion of Third-Party Culpability Evidence

5           The focus of this case is on the California Court of Appeal's determinations with respect

6   to the issues here.  It therefore makes sense to start with that background and analysis.

7           The prosecution presented a "Motion In Limine To Exclude Third
    Party Culpability." The trial court used Evidence Code section 352
8       to preclude the defense from introducing evidence that in January
        2009, while defendant was in jail awaiting trial, the weapon used to
9       kill Angelo Hurst and wound Brandon Boyd was used in a shooting
        in San Francisco. The court ruled that the proposed evidence would
10      necessitate "an undue consumption of time, and ... a substantial
        danger that the jurors would be confused or potentially misled, ...
11      and ... the probative value is so weak." The same grounds were
        cited to exclude evidence that several months after the shooting "a
12      search warrant was being served at the house of the driver [i.e.,
        Tereaun], showing another gun and drug sales.[N.4] Again ... I can't
13      wrap my mind around [how] that evidence would provide
        substantial proof of the probability that the driver was the shooter."
14
            [N.4] The prosecution stated the matter a bit more clearly in
15          the written motion: "Tereaun Berry's residence was
            searched in October 2007 which was unrelated to the case at
16          bar. During the search, a .40 caliber firearm was located and
            confiscated by the police. The firearm was determined to
17          NOT be the weapon used by the defendant in this case in
            June 2007."
18
        Defendant attacks the first ruling as erroneous because the
19      subsequent use of the murder weapon linked Tereaun to the Hurst
        killing and thus could raise reasonable doubt as to defendant's guilt.
20      We consider this contention according to well established
        principles.
21
        "'We repeatedly have indicated that, to be admissible, evidence of
22      the culpability of a third party offered by a defendant to
        demonstrate that a reasonable doubt exists concerning his or her
23      guilt, must link the third person either directly or circumstantially to
        the actual perpetration of the crime. In assessing an offer of proof
24      relating to such evidence, the court must decide whether the
        evidence could raise a reasonable doubt as to defendant's guilt....'
25      [Citations.] [¶] In *People v. Hall* (1986) 41 Cal.3d 826, we held that
        'the third–party evidence need not show "substantial proof of a
26      probability" that the third person committed the act; it need only be
        capable of raising a reasonable doubt of defendant's guilt.'
27      [Citation.] 'Our holding [in *Hall* ] did not, however, require the
        indiscriminate admission of any evidence offered to prove third–
28      party culpability. The evidence must meet minimum standards of

                                        8

relevance: "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." [Citation.] We also reaffirmed that such evidence is subject to exclusion under Evidence Code section 352. [Citation.]' [Citation.]" (*People v. McWhorter* (2009) 47 Cal.4th 318, 367–368.)

"An appellate court applies the abuse of discretion standard to review any ruling by a trial court on the admissibility of evidence, including a ruling on an Evidence Code section 352 objection." (*People v. Cox* (2003) 30 Cal.4th 916, 955.) That means reversal is not appropriate unless we are compelled to conclude that that the trial court " ' "exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" ' [Citation.]" (*People v. Williams* (2008) 43 Cal.4th 584, 634–635.)

Seizing upon the court's use of the words "substantial proof of the probability that the third person committed the homicide herein" (italics added), defendant asserts that the court "applied [an] incorrect and unduly high standard to admissibility" and thus "failed to properly weigh the relevant factors under section 352." By excluding this evidence, defendant also claims the trial court deprived him of his "constitutional rights to due process and to present a defense."

The entire, if implicit, foundation of defendant's position is that whoever had the gun in June 2007 still had possession when it was used 18 months later. But defendant will derive no benefit unless he can establish the next logical stage, which is to tie that specific gun in both instances to Tereaun. This defendant cannot do. Without something tending to show that Tereaun was in San Francisco with that weapon, defendant cannot satisfy the factual predicate of " ' "direct or circumstantial evidence linking the third person to the actual perpetration of the crime" ' " (*People v. McWhorter, supra*, 47 Cal.4th 318, 368), and therefore no abuse of the trial court's discretion. (*People v. Williams, supra*, 43 Cal.4th 584, 634–635.) In these circumstances, the court's unfortunate use of what is admittedly an incorrect standard may be disregarded as harmless because defendant cannot satisfy the correct standard.

Although defendant attempts to elevate the issue to one of federal constitutional dimension, this is not correct. "As a general matter, the '[a]pplication of the ordinary rules of evidence ... does not impermissibly infringe on a defendant's right to present a defense.' [Citations.] Although completely excluding defense evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of state law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is

1
2
3
4
5
6

> that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836, and
> not the stricter beyond–a–reasonable–doubt standard reserved for
> errors of constitutional dimension (*Chapman v. California* (1967)
> 386 U.S. 18, 24)." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–
> 1103; accord, *People v. Boyette* (2002) 29 Cal.4th 381, 427–428.)
> Application of Evidence Code section 352 is within this principle.
> (*People v. Brown* (2003) 31 Cal.4th 518, 545.) Moreover, we
> cannot go against the California Supreme Court and the United
> States Supreme Court, both of which have rejected identical claims.
> (*People v. Hall, supra*, 41 Cal.3d 826, 834–835; *Holmes v. South
> Carolina* (2006) 547 U.S. 319, 327–328.)

7   Duran, 2012 WL 5378286, at **3–4.

8        The only Supreme Court case that need be cited is Holmes v. South Carolina, 547 U.S.

9   319, 126 S.Ct. 1627 (2006), as it supplies the clearly established Supreme Court law on the

10   subject.  In this case, the State produced strong forensic evidence of the defendant's guilt.  Id. at

11   322.  However, the defendant wished to counter this evidence with expert testimony designed to

12   show that the evidence had been contaminated, and that the police were attempting to frame him.

13   Id. at 322–23.  Also, defendant wished to introduce evidence that another man had been in the

14   neighborhood on the day of the crime, and that this man had either admitted the crime or

15   acknowledged petitioner's innocence.  Id. at 323.

16        The Supreme Court focused on the incorrect standard announced by the state court which

17   judged the propriety of the third-party culpability evidence based on the strength of the

18   prosecution's case—"where there is strong evidence of an appellant's guilt, especially where there

19   is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not

20   raise a reasonable inference as to the appellant's own innocence."  Id. at 324 (internal quotations

21   and citations omitted).  Applying this standard, the state court held that petitioner could not

22   "overcome the forensic evidence against him to raise a reasonable inference of his own

23   innocence."  Id. (internal quotations and citations omitted).  In essence, if the state had submitted

24   a strong case of objective evidence, the "other guy did it" defense would be precluded.

25        Holmes determined to the contrary by comparing  a previous South Carolina case, State v.

26   Gregory, 198 S.C. 98, 16 S.E. 2d 532 (1941), which had held that the appropriate standard was to

27   permit evidence of third-party culpability when it raised a reasonable inference of the defendant's

28   innocence.  Holmes, 547 U.S.at 324, 328.  That is, the probative value of the *defense* third-party

10

1   evidence was to be judged without viewing it through the prism of the strength of the prosecution

2   case.  Holmes went on to find that focusing on the strength of the prosecution's case ran afoul of

3   established Supreme Court precedent which did not allow state evidentiary rules which were

4   illogical or disproportionate to the ends they were designed to promote to override the

5   constitutional right to present a defense.  Id. at 328–31.

6        Petitioner attempts to link the appellate court here with the errant ruling of the South

7   Carolina court.  However, as seen from the quotes above, the California appellate court did no

8   such thing.  First, it found the trial court's standard for admission—did it *substantially* prove that

9   the third person was the culprit—erroneous.  However, it also found that the third-party

10  culpability evidence had to be *relevant*, i.e., if there was not a foundational link to the third party,

11  the evidence was to be excluded.  The appellate court could not find that link.  This is no different

12  from that standard which Holmes enunciated:

13              "[S]tate and federal rulemakers have broad latitude under the
            Constitution to establish rules excluding evidence from criminal
14          trials." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct.
            1261, 140 L.Ed.2d 413 (1998); *see also Crane v. Kentucky*, 476
15          U.S. 683, 689–690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986);
            *Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 74
16          L.Ed.2d 646 (1983); *Chambers v. Mississippi*, 410 U.S. 284, 302–
            303, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Spencer v. Texas*, 385
17          U.S. 554, 564, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). This latitude,
            however, has limits. "Whether rooted directly in the Due Process
18          Clause of the Fourteenth Amendment or in the Compulsory Process
            or Confrontation Clauses of the Sixth Amendment, the Constitution
19          guarantees criminal defendants 'a meaningful opportunity to
            present a complete defense.' " *Crane, supra*, at 690, 106 S.Ct. 2142
20          (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct.
            2528, 81 L.Ed.2d 413 (1984); citations omitted). This right is
21          abridged by evidence rules that "infring[e] upon a weighty interest
            of the accused" and are " 'arbitrary' or 'disproportionate to the
22          purposes they are designed to serve.' " *Scheffer, supra*, at 308, 118
            S.Ct. 1261 (quoting *Rock v. Arkansas*, 483 U.S. 44, 58, 56, 107
23          S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

24                              ***

25          While the Constitution thus prohibits the exclusion of defense
            evidence under rules that serve no legitimate purpose or that are
26          disproportionate to the ends that they are asserted to promote, well-
            established rules of evidence permit trial judges to exclude evidence
27          if its probative value is outweighed by certain other factors such as
            unfair prejudice, confusion of the issues, or potential to mislead the
28          jury. *See*, e.g., Fed. Rule Evid. 403; Uniform Rule of Evid. 45

                                   11

(1953); ALI, Model Code of Evidence Rule 303 (1942); 3 J. Wigmore, Evidence §§ 1863, 1904 (1904). Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.' " *Crane*, 476 U.S., at 689–690, 106 S.Ct. 2142 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); ellipsis and brackets in original). *See also Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. See, e.g., 41 C.J.S., Homicide § 216, pp. 56–58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am.Jur.2d, Homicide § 286, pp. 136–138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged .... ***[Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial"* (footnotes omitted)). Such rules are widely accepted,[] and neither petitioner nor his amici challenge them here.***

Holmes, 547 U.S. at 324, 326–27 (emphasis and bold added).[1]

---

[1]  If more Supreme Court holdings are necessary, one need look no further than United States v. Scheffer, 523 U.S. 303, 308–309, 118 S.Ct. 1261 (1998).

A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. [] *See Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 653–654, 98 L.Ed.2d 798 (1988); *Rock v. Arkansas*, 483 U.S. 44, 55, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045–1046, 35 L.Ed.2d 297 (1973). A defendant's interest in presenting such evidence may thus " 'bow to accommodate other legitimate interests in the criminal trial process.' " *Rock*, *supra*, at 55, 107 S.Ct., at 2711 (quoting *Chambers, supra*, at 295, 93 S.Ct., at 1046); accord, *Michigan v. Lucas*, 500 U.S. 145, 149, 111 S.Ct. 1743, 1746, 114 L.Ed.2d 205 (1991). As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *Rock, supra*, at 56, 107 S.Ct., at 2711; *accord, Lucas, supra*, at 151, 111

The problem with petitioner's evidence herein is identical to the highlighted statement. Petitioner supplied (and has supplied) no critical *evidentiary* link of ownership or possession to the gun used in the San Francisco crime, the same gun admittedly used in the crime at issue, with the third party he so desires to implicate as the shooter. Submitting the mere fact that the gun at issue had been used in a San Francisco crime went no distance in linking that gun to the third party Tereaun; the jury would have been asked to speculate that it was the third party's gun by whatever argument petitioner's trial counsel could have mustered. Arguments on facts such as Tereaun had mental issues which caused him to be violent, or that Tereaun had otherwise violated criminal law, or that Tereaun owned a gun of some sort (quite possibly the different gun found at his residence in 2007), or that Tereaun might have had a motive to shoot a member of the group who had been involved in an assault on his sister, had nothing to do in an evidentiary-linkage sense with ownership/possession/use of the gun at issue in this crime which had been found in San Francisco. Petitioner's suggestion that because he had some point to argue about Tereaun's involvement in the murder/assault at issue, then an inference could be drawn that Tereaun owned/possessed/used the later-found murder weapon on the day of the crime, is pure bootstrapping. While arguments may link evidence to establish foundational relevancy, arguments *per se* do not supply the foundational, relevant *evidence* themselves. Without some evidentiary link of the third party to the gun found in San Francisco, submission to the jury of the fact of the gun's use in a later San Francisco crime and arguments that it must have been the third

---

S.Ct., at 1747. Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused. *See Rock, supra*, at 58, 107 S.Ct., at 2712–2713; *Chambers, supra*, at 302, 93 S.Ct., at 1049; *Washington v. Texas*, 388 U.S. 14, 22–23, 87 S.Ct. 1920, 1924–1925, 18 L.Ed.2d 1019 (1967).

***

State and Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial. Indeed, the exclusion of unreliable evidence is a principal objective of many evidentiary rules. *See*, e.g., Fed. Rules Evid. 702, 802, 901; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2794–2795, 125 L.Ed.2d 469 (1993).

1   party's gun (or even that of petitioner) would have been improper.

2          Petitioner suggests that the evidence of the gun's final whereabouts should nevertheless

3   have been submitted to the jury "to sort out the relevance" on its own.  Why, then should we have

4   rules of evidence at all?  Perhaps we should just throw any evidence before the jury and let the

5   jury sort it out.  However, petitioner does not always take that view when evidence, adverse to

6   petitioner, is admitted at odds with the rules.  See infra, hearsay discussion.  The correct view is

7   that all the appropriate evidence rules should be utilized, except when they run afoul of the

8   Holmes holding.  Such did not occur here.

9          The undersigned concedes, nevertheless, that after setting forth the correct reason why the

10  evidence would have been inadmissible, i.e., speculative with respect to the third-party

11  connection, the appellate court did muddle the picture somewhat with its discussion of whether a

12  federal due process error had been set forth.  This re-quote contained within the larger quote

13  above is given:

14          Although completely excluding defense evidence of an accused's
            defense theoretically could rise to this level, excluding defense
15          evidence on a minor or subsidiary point does not impair an
            accused's due process right to present a defense. [Citation.] If the
16          trial court misstepped, '[t]he trial court's ruling was an error of state
            law merely; there was no refusal to allow [defendant] to present a
17          defense, but only a rejection of some evidence concerning the
            defense.' [Citation.]
18

19  People v. Duran, 2012 WL 5378286, at *4.  However, when viewing this ambiguous quote within

20  the context of its entire ruling, the appellate court was saying no more than what Holmes allows:

21  "Plainly referring to [evidentiary] rules of this type, we have stated that the Constitution permits

22  judges to exclude evidence that is  . . . only marginally relevant . . . ."  Holmes, 547 U.S. at 326–

23  27 (internal quotations and citations omitted).[2]

24  _____

25  [2]  As the undersigned has discussed, the finding of the gun involved in the murder/assault at issue
    here, later on in San Francisco had no relevance, much less "marginal relevance" because the
26  identity of the actor who set in motion the reasons why it wound up there was purely speculative.
    This is not to say that if an evidentiary link had been established, the evidence would not have
27  been important.  Of course, if it had been shown that Tereaun had himself set in motion the facts
    which caused the gun to find its way to another city, a strong argument could have been made that
28  Tereaun was the shooter since it was his gun.

                                                      14

Thus, the California Court of Appeal did not unreasonably apply established Supreme Court precedent. Suffice it to say also, that based on the discussion above, the undersigned would have no difficulty in finding the insufficiency of a federal due process claim, if the claim were to be reviewed *de novo*. The relevance of the sought-to-be-introduced evidence of the gun in San Francisco depended upon a purely speculative link to the third party, Tereaun, and was properly excluded under state law, and more to the point—under Holmes.

B. Rejection of Accomplice Instructions

Petitioner's claim that the trial court should have given accomplice instructions is a difficult one to fathom. Petitioner's defense was that third party Tereaun was the shooter, not that petitioner was knowingly assisted or aided by Tereaun when petitioner shot at the victims. Perhaps, petitioner means that he gave his gun to Tereaun with instructions on whom to shoot, but petitioner does not actually pose that scenario. While under California law, a defendant cannot be convicted on the word of an accomplice alone, California Penal Code section 1111, the facts are crystal clear that such was not the case at petitioner's trial even if one assumes Tereaun was an accomplice. One final possibility exists, a jury may be instructed that the testimony of an accomplice can be viewed with suspicion, and perhaps that was the instruction desired by petitioner. See CALJIC 3.18; People v. Guiuan, 18 Cal. 4th 558, 566–69 (1998).

In any event, petitioner has not stated a constitutional claim as recognized by the United States Supreme Court. It is elementary to federal habeas corpus jurisprudence that relief will not lie for alleged errors of state law in conducting a trial. Estelle v. McGuire, 502 U.S. 62, 71–72, 112 S.Ct. 475 (1991). Only in situations where the error touches upon matters of fundamental fairness can relief be given, and those instances where fundamental fairness is at stake have been interpreted very narrowly. Id. at 72–73. Not only is a corroboration rule for accomplice testimony not a matter of fundamental fairness, but federal law, including that of the United States Supreme Court, has long not required evidence beyond that given by an accomplice to sustain a conviction. United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993); see also United States v. Fritts, 505 F.2d 168, 169 (9th Cir. 1974) ("Finally, Fritts claims reversal is in order because the trial court failed to give, on its own motion, a cautionary instruction on

15

1   accomplice testimony. We have already rejected the contention. United States v. Randall, 491

2   F.2d 1317 (9th Cir. 1974).  The parallel argument that uncorroborated accomplice testimony

3   cannot lead to a conviction has been similarly rejected.  United States v. Castro, 476 F.2d 750

4   (9th Cir. 1973).").  Moreover, in a case where the claimed error was the failure to give an

5   accomplice corroborating evidence instruction, the Supreme Court held: "[T]here is no absolute

6   rule of law preventing convictions on the testimony of accomplices if juries believe them."

7   Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192 (1917); see also United States v.

8   Augenblick, 393 U.S. 348, 352, 89 S.Ct. 528 (1969) ("When we look at the requirements of

9   procedural due process, the use of accomplice testimony is not catalogued with constitutional

10   restrictions."); United States v. Lopez, 803 F.2d 969, 973 (9th Cir. 1996) ("The uncorroborated

11   testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or

12   unsubstantial on its face.").  It follows in this AEDPA context, therefore, that a conviction

13   obtained in state court primarily, or only, on accomplice testimony cannot be challenged as a

14   "federal error."  It further follows that a cautionary instruction regarding an accomplice's

15   testimony cannot be a fundamental due process requirement.  Fritts, 505 F.2d at 169; see also

16   Barco v. Tilton, 694 F.Supp.2d 1122, 1136 (C.D. Cal. 2010) (accomplice instruction in state

17   criminal case is strictly a matter of state law).

18          After AEDPA, the focal issue is whether the United States Supreme Court has clearly

19   announced a rule which would direct that a particular claim would be encompassed under some

20   part of the Constitution.  There is no rule established by the Supreme Court that corroboration

21   evidence is necessary for accomplice testimony.  Indeed, the opposite is true.  See Caminetti, 242

22   U.S. at 495.  Nor can one say that the need for corroboration, or an instruction regarding that

23   corroboration, implicates fundamental fairness because the federal courts, even prior to AEDPA,

24   refused to find it constitutionally based.  See Necoechea, 986 F.2d at 1282 (uncorroborated

25   accomplice testimony sufficient to sustain a conviction); Fritts, 505 F.2d at 169 (trial court did not

26   err in refusing to give cautionary instruction on accomplice testimony).  Even if petitioner's

27   precise claim had not been rejected by the Supreme Court and others, petitioner's extrapolation of

28   the most general statements on fundamental fairness, cannot overcome the lack of specific

1    Supreme Court authority on the point advanced.  Such spells the death knell of these claims.

2           However, one of the pre-AEDPA accomplice corroboration analyses, <u>Laboa v. Calderon</u>,

3    224 F.3d 972, 979 (9th Cir. 2000), citing <u>Hicks v. Oklahoma</u>, 447 U.S. 343, 346, 100 S.Ct. 2227,

4    65 L.Ed.2d 175 (1980), found that if state law creates an "entitlement" to its application, due

5    process forbids the "arbitrary" application of the state law.  Firstly, the undersigned cannot find

6    any Supreme Court authority holding that the <u>Hicks</u> rule applies in the AEDPA context.  This

7    should not be surprising in that nearly every state law regarding criminal process "entitles" a

8    litigant to its application.  There are very few laws passed with the proviso that the statute may be

9    applied, or not, depending on the judge's predeliction on the matter.  The California statute in

10   question, California Penal Code section 1111, admits of no such discretion.  But, if <u>Hicks</u> were to

11   be applied according to its literal terms, the violation of *any* state criminal process or evidentiary

12   statute would constitute a cognizable federal claim in habeas corpus as long as the adjective

13   "arbitrary" was used to characterize its application.  This cannot be the law as the Supreme Court

14   has stated in the strongest of terms that a violation of state law does not entitle one to federal

15   habeas corpus relief except where that violation implicates the fundamental fairness of the

16   criminal proceeding.  <u>Estelle</u>, 502 U.S. at 72, and n.2, disapproving <u>Blair v. McCarthy</u>, 881 F.2d

17   602 (9th Cir. 1989) (a case whose found error of failure to inform petitioner of a mandatory

18   parole term was based on state law); <u>see</u> <u>also</u> <u>Rivera v. Illinois</u>, 556 U.S. 148, 158, 129 S.Ct. 1446

19   (2009) ("A mere error of state law, we have noted, is not a denial of due process.  The Due

20   Process Clause, our decisions instruct, safeguards not the meticulous observance of state

21   procedural prescriptions, but the fundamental elements of fairness in a criminal trial." [internal

22   quotations and citations omitted]).

23          Thus, in order for <u>Hicks</u> to be harmonized with the wall of post-AEDPA authority on the

24   irrelevance of state law in federal habeas, the state law in question must deal with an issue

25   implicating the fundamental fairness of a criminal proceeding.  Indeed, in <u>Hicks</u> itself, the issue in

26   question concerned the fundamental right to have a jury determine those matters which state law

27   commanded the jury to decide.  Because it has already been determined above that the issue of

28   corroboration of accomplice testimony does not implicate fundamental fairness concerns, the

1    claims of lack of corroborating evidence and faulty accomplice instruction should be denied as

2    failing to set forth a federal claim.[3]

3              C.   Ineffective Assistance of Counsel for Failure to Object to Prosecutorial Vouching

4              No party here advances the proposition that prosecutorial "vouching," *i.e.*, using the

5    credibility of the State to argue that a witness is telling the truth (or lying), is anything but a

6    constitutional violation of due process when infecting the trial with fundamental unfairness.  See

7    e.g., Barnes v. Almager, 526 Fed.Appx. 775, 778 (9th Cir. 2013) ("However, prosecutorial

8    vouching rises to the level of constitutional violation only if it '"so infect[s] the trial with

9    unfairness as to make the resulting conviction a denial of due process."'" *Darden v. Wainwright*,

10   477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*,

11   416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).)  Petitioner herein has chosen to filter

12   the claim through an ineffective assistance of counsel rubric because of the failure to object.

13   However, in either situation, vouching has to exist in the first instance—here it did not.

14             The appellate court set forth a discussion of this issue:

15                    When Detective Kellis testified about interviewing Tereaun Berry
                      three days after the shooting, he was asked: "Now, can you describe
16                    what his demeanor was like when he was ... asked questions about
                      what happened on June 20?" Kellis replied: "He appeared to be
17                    nervous, kind of scared, but open, and didn't appear to be holding
                      anything back." Defendant contends this amounted to Kellis
18                    improperly "vouching" for Berry's credibility, and that this
                      improper use was aggravated by the prosecutor's closing argument.
19                    But what the prosecutor did was hardly vouching, which usually
                      involves an attempt to bolster a witness's credibility "by reference
20                    to facts outside the record" (*People v. Medina* (1995) 11 Cal.4th
                      694, 757), such as a personal opinion (*People v. Martinez* (2010) 47
21                    Cal.4th 911, 958), or invoking the prestige, reputation, or depth of
                      experience of the speaker or their office. (*People v. Huggins* (2006)
22                    38 Cal.4th 175, 206–207.) And while "[l]ay opinion about the
                      veracity of particular statements by another is inadmissible"
23                    (*People v. Melton* (1988) 44 Cal.3d 714, 744), the prosecutor was
                      not soliciting an answer about credibility. The Detective was simply
24                    being asked for his recollection of Tereaun's physical appearance or
                      behavior, not his opinion about whether Tereaun was telling the
25                    truth.FN6  And  if  the  prosecutor  subsequently  argued  from

26   _____

27   [3]  The appellate court assumed that an accomplice instruction should have been given, and found
     the lack of any such instructions harmless under state law.  However, no *federal* claim being
     stated, the undersigned will not assume that one has been stated and perform a harmless error
28   analysis.

                                              18

1

2

3

> Detective Kellis's testimony that "Tereaun [was] honest in the interview," that characterization is not independently improper, because "[a] prosecutor may comment upon the credibility of witnesses based on facts contained in the record." (*People v. Martinez, supra*, at p. 958.)

4    <u>Duran</u>, 2012 WL 5378286, at *6.

5    To the extent that petitioner believes that an objection would have been appropriate under

6    state law, that avenue is foreclosed in that the appellate court's finding that vouching did not

7    occur under state law is binding on this federal court.  And, counsel cannot be found deficient for

8    not engaging in a futile act.  <u>Rupe v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1993).

9    Petitioner's claim fares no better under federal law because the appellate court's reasoning

10   is not AEDPA unreasonable.  Far from it.  The question asked was merely a fact question about

11   the interrogated person's demeanor.  This is no different than asking a witness what the

12   interrogated person said, or did when a question was asked.  The prosecutor simply asked what

13   the interrogated person looked like in terms of expression, etc.  If a prosecutor's argument about

14   witness demeanor is not vouching, and it is not, <u>United States v. Gooch</u>, 506 F.3d 1156, 1160–61

15   (9th Cir. 2007), it follows that a question directed to a witness about an interrogated person's

16   demeanor is equally valid.  Again, counsel cannot have been ineffective for not making a futile

17   objection.  Accordingly, this claim should be denied.

18   D.  <u>Failure to Object to Hearsay</u>

19   Again, the setting and discussion for this issue is concisely set forth in the Court of Appeal

20   opinion:

> Lastly, defendant urges that his trial counsel should have made a hearsay objection when Montano testified that just before the shooting "a van passed, and Kevin [Ayers] was like, 'There goes Joe right there.' " Hearsay it might have been, but in light of the abundant and uncontested evidence that defendant was in the van, it is inconceivable that counsel's silence could be prejudicial.

21

22

23

24   <u>Duran</u>, 2012 WL 5378286, at *6.

25   Petitioner produced no evidence at trial that he was not in the van, and the evidence at trial

26   placed him there.[4]  Despite petitioner's uncontested van location, at least with respect to

27

28   ---
[4] Moreover, by not contesting the Court of Appeal opinion on this fact of location, the factual findings of that court on petitioner's van location, <u>Duran</u>, 2012 WL 5378286, at *1, are final.

evidence,[5] petitioner maintains that his counsel was ineffective by not objecting to the hearsay.

> Under the AEDPA, the primary issue is whether the state court adjudication of the *Strickland* claims was objectively reasonable. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). To prevail on an IAC claim under *Strickland*, a petitioner must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. In evaluating IAC claims, "our cases require that ... [we] use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, ―― U.S. ――, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013) (quoting *Pinholster*, 131 S.Ct. at 1403).
>
> As to the first prong, a petitioner must prove that counsel's performance was so deficient that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. The Supreme Court has instructed lower courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id*. at 689, 104 S.Ct. 2052. As to the second prong, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id*. at 694, 104 S.Ct. 2052. Finally, even if Woods can satisfy both of those prongs, the AEDPA requires that a federal court find the state court's contrary conclusions are objectively unreasonable before granting habeas relief. *See Landrigan*, 550 U.S. at 473, 127 S.Ct. 1933.

Woods v. Sinclair, 764 F.3d 1109, 1131–32 (9th Cir. 2014)

As the Court of Appeal noted, under any reading of the facts, petitioner could not have been prejudiced by not objecting. It may well have been that by objecting, counsel would have looked foolish at worst, or emphasized petitioner's presence as well. By no stretch of the imagination could the Court of Appeal's determination be construed as AEDPA unreasonable.

E.  Suppression of Impeachment Information

Citing letters and e-mails from the prosecutor's office whose enclosures or attachments would indicate that Tereuan's criminal record was made known to defense trial counsel, or previous defense counsel, respondent argues that no suppression took place. Citing to declarations of various defense counsel, petitioner just as strongly argues that their records do not indicate that all impeachment material was disclosed. Clearly some of the criminal records were

---

[5]  In final argument, counsel for the defense did not even affirmatively argue by reference to any facts that his client was not in the van.

1   disclosed in that the next section addresses whether counsel was ineffective for not impeaching

2   Tereuan with the criminal record he indisputably possessed.  However, there is little sense in

3   attempting to resolve this almost unresolvable factual dispute before addressing whether

4   sufficient prejudice was demonstrated assuming that petitioner's version is closer to reality.[6]

5          First, the court sets forth what petitioner asserts his counsel did not receive.  This is a

6   difficult task in that petitioner does not relate very well what was not disclosed in any way, shape

7   or form, as opposed to not all information regarding an otherwise disclosed event.  For Brady[7]

8   purposes, the distinction is relevant.  However, as best the undersigned can determine, petitioner's

9   trial counsel was aware of the following Tereaun prior bad acts before trial:

10      1.   A misdemeanor assault on a police officer, California Penal Code section 241(b)

11           conviction.  This conviction itself is inadmissible as it is a misdemeanor, People v.

12           Wheeler, 4 Cal. 4th 284, 300 (1992), abrogated on other grounds, Johnson v. California,

13           545 U.S. 162 (2005), but the conduct underlying the misdemeanor may be used for

14           impeachment purposes in the discretion of the court if it constitutes moral turpitude.  Id.

15           Assault on a police officer is a crime of moral turpitude.  People v. Lindsay, 209 Cal. App.

16           3d 849, 857 (1989).  Petitioner asserts that his counsel did not have the underlying details.

17      2.   A distinct aggravated assault (found in a probable cause statement).  Petitioner claims that

18           this information was "buried" in the document, but does not argue that reasonable counsel

19           would not have read the entire document.

20      3.   A drug-selling conviction.  Petitioner's trial counsel asserts in a later-filed declaration that

21           he was aware that Tereaun was on probation "possibly" for selling controlled substances.

22      4.   Receiving stolen property; see Petition at 52

23   _____

24   [6]  The alleged suppression was not at issue on direct review.  Rather, the declarations and letters
     etc. were submitted with a state habeas petition.  Both the appellate court on habeas and the
25   California Supreme Court issued silent denials.  Petitioner is incorrect in asserting that the court
     engages in de novo review, at least with respect to the prejudice issue, which at its core is a legal
26   determination.  Rather, as set forth in the legal standards above, Himes supra, the undersigned
     must independently review the record to determine whether the state courts were AEDPA
27   unreasonable.  Moreover, there is no need to address petitioner's assertion that he is entitled to an
     evidentiary hearing as the undersigned is assuming petitioner's version of events.
28   [7]  Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963).

1      5.   Illegal possession of firearms; see Petition at 52.

2    Thus, it may well be that the only crime for which petitioner had no information was a destruction

3    of evidence arrest/conviction.

4          Again, assuming that the above is true, and that counsel lacked some information about

5    Tereaun's criminal record, and assuming this could be parlayed into a <u>Brady/Giglio</u> violation, the

6    question becomes whether these assumed omissions had any material effect on the verdict.

> In *Brady*, this Court held "that the suppression by the prosecution
> of evidence favorable to an accused upon request violates due
> process where the evidence is material either to guilt or to
> punishment, irrespective of the good faith or bad faith of the
> prosecution." 373 U.S., at 87, 83 S.Ct. 1194. We have since held
> that the duty to disclose such evidence is applicable even though
> there has been no request by the accused, *United States v. Agurs*,
> 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that
> the duty encompasses impeachment evidence as well as exculpatory
> evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct.
> 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is
> a reasonable probability that, had the evidence been disclosed to the
> defense, the result of the proceeding would have been different."
> *Id*., at 682, 105 S.Ct. 3375; see also *Kyles v. Whitley*, 514 U.S. 419,
> 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

15   <u>Strickler v. Greene</u>, 527 U.S. 263, 280, 119 S.Ct. 1936 (1999).

16                                        ***

> He must convince us that "there is a reasonable probability" that the
> result of the trial would have been different if the suppressed
> documents had been disclosed to the defense. As we stressed in
> *Kyles*: "[T]he adjective is important. The question is not whether
> the defendant would more likely than not have received a different
> verdict with the evidence, but whether in its absence he received a
> fair trial, understood as a trial resulting in a verdict worthy of
> confidence." 514 U.S., at 434, 115 S.Ct. 1555.

21   <u>Id.</u> at 289–90.

22          Utilizing this standard, the undersigned cannot find that the suppression undermined

23   confidence in the verdict, and more to the point, that the state courts would be AEDPA

24   unreasonable in determining such, *i.e.*, that reasonable jurists could not find the omissions of such

25   a nature that they were material to the verdict as defined above.[8]  Most importantly, trial counsel

26

---

27   [8]  The federal court must look to possible logical reasons why the state court found as it did, then
     applying the AEDPA standard, even if the state court was unexpressive of the reasons.
28   <u>Harrington</u>, 131 S.Ct. at 786.

1   purposefully determined not to attempt impeachment of Tereaun.  While counsel's tactics raise

2   another question ultimately resolved in the following section, the point here is that any rounding

3   out the of the criminal violation information that counsel did have was not going to change that

4   determination.  Even in hindsight, counsel hedges and states in his declaration attached to the

5   state habeas petition that he is unsure if having all of the information would have changed his

6   mind.  Exhibit 18 (Pendergast Declaration) at 24.  Petitioner cannot, in *this* section, point to some

7   theoretical "other" counsel, and what that other counsel might have done.  In reality, and by his

8   own words, it is not probable that *actual* counsel would have used the additional criminal

9   conviction information.  By definition, that is a lack of materiality.

10       Even if we were judging the standard of materiality by an objective standard of what

11   another counsel may have done with Tereaun's criminal record (and this discussion controls the

12   subsequent ineffective assistance claim as well), the asserted suppression of parts of Tereaun's

13   criminal record falls far short of the standard of showing to a probability that the verdict herein is

14   unworthy of confidence.  One need look no further than cases such as Giglio v. United States, 405

15   U.S. 150, 92 S.Ct. 763 (1972), and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555 (1995) to

16   understand what *material* suppression means.  In Giglio, a co-conspirator's testimony as to the

17   defendant's actions was indelibly marred by the failure to disclose an agreement not to prosecute

18   the co-conspirator.  In Kyles, information was suppressed, *inter alia*, statements of eyewitnesses,

19   which would have substantially reduced the credibility of, *i.e.*, essentially destroyed, the

20   government's primary witnesses.  Suppression which goes to the heart of the case is that

21   suppression which is material as defined by Strickler.  Even in this latter case, documents

22   impeaching the eyewitness testimony were found to be immaterial because of the circumstances

23   of the case.  Strickler, 527 U.S. at 296.

24       All petitioner can point to here is an asserted suppression of a witness' criminal history

25   that had *nothing* to do with the operative facts of *this* case.  The suppression as posited consisted

26   of details, for the most part, of a relatively minor criminal record which would have come as no

27   surprise to the jury in the circumstances of this case.  Moreover, insofar as the *trial* testimony is

28   concerned, Tereaun's and Tecora's antics in the courtroom, which included Tereaun's refusal to

23

answer questions until the information was pried out of him, *e.g.*, "no that didn't happen—well, I don't remember—maybe it happened, etc., and his calling the trial judge "dawg" numerous times in front of the jury, were all examples of conduct which would have greatly reduced the credibility of the trial testimony and dwarfed any reference to any of Tereaun's prior crimes. Further, it was not the trial testimony of Tereaun which would have mattered to the jury. Any juror with a beating heart would have recognized that Tereaun and Tecora, thinking themselves safe from any prosecution, had determined to make a farce out of the trial so that no one would be convicted. It was really the pretrial statements of these witnesses unaccompanied by histrionics, given at a time when the investigative eye would have been focused on them as well as petitioner, which sealed petitioner's fate. The obvious potential bias to exculpate himself (Tereaun) would have been the impeachment the jury would have been concerned with—not whether Tereaun had committed a misdemeanor assault, or had been involved in drug deals and the like.

Petitioner is correct in that the evidence was not overwhelming against him, and depended greatly on the previous statements of the car occupants. As such the statements were essentially the only *direct* evidence concerning who fired the weapon. But see Duran, 2012 WL 5378286, at *1 ("[D]uring a subsequent police interview, Hawkins identified Tereaun's "friend," who "they call Joe" and who was sitting in the front passenger seats, as the person who fired the shots."). However, in relative terms, the case against Tereaun was non-existent as *no* direct evidence had him firing the weapon. For whatever reason, petitioner made the determination not to inculpate Tereaun by testimony, as was his absolute right, but this exercise of rights cannot stand as affirmative evidence directly identifying Tereaun as the shooter. Petitioner was reduced to arguing that because Tereaun was a sociopath, *maybe* such anti-societal impulses were working that day (but why not other days—one would have expected Tereaun to have a continuous and serious assault record); that because he *might* have had a motive to fire shots at the persons assembled outside because of a relatively stale assault by one of them on his sister, Tereaun was the shooter (but why was not this slight avenged long before petitioner got in the car); that because Tereaun admitted to having a gun his car (most likely the gun later discovered by the police in Tereaun's residence that was *not* the gun used in the drive-by shooting at issue)—it was

Tereaun who was the shooter.  None of these weak-to-start-with arguments would have been aided in the least by highlighting Tereaun's relatively minor criminal record before the jury.[9]

Finally, the information which counsel assumedly did not have was not confidence-shattering in the credibility context as it might be if something like a felony perjury or fraud conviction had been omitted.  Drug usage and assaults, while having some nexus to one's moral character, are not usually, directly indicative of lack of truth telling.  Nothing we know about those convictions today would take this evidence out of its usual, and generally inconsequential, impeachment posture.  Destruction of evidence comes closer, but it cannot be said that all fairminded jurists would have lost confidence in the fairness of the verdict if only the jury had been told of this impeachment.

Again, remembering that this court must explore reasonable possibilities for the state court's summary denial of the suppression claim (and the ineffective assistance of counsel claim), and lack of prejudice was an obvious possibility for both claims, the denial of the claims was not AEDPA unreasonable.  No evidentiary hearing is required or necessary to make this judgment, and the claims should be denied.

F.  Ineffective Assistance of Counsel Regarding Lack of Impeachment

As forecasted above, petitioner's last claim describes his counsel as ineffective for not impeaching Tereaun with whatever criminal record trial counsel possessed.  Petitioner's trial counsel said he did not do this because he wanted the jury to believe Tereaun in several respects, *e.g.*, most probably the washing of the car and the admission by Tereaun of a gun in his car. Totally destroying Tereaun's credibility may have diminished those facts.

---

[9]  Petitioner also argued that the fact that Tereaun had his mother's car cleaned after the shooting espoused his consciousness of guilt.  Notwithstanding that the cleaning of the car after the gun shooting incident may have been anticipated whether or not Tereaun was the shooter, this asserted consciousness of guilt pales before petitioner's unexplained, months-long flight to Mexico after the shooting.  But, in any event, impeachment by discussing Tereaun's criminal record would not have been material for this argument.  It appears that petitioner is really arguing that any counsel would have had reason to place Tereaun's criminal record before the jury on the chance that the jury would have (improperly) thought Tereaun a bad person, and hence the shooter.  But the jury needed no such impetus as Tereaun revealed his lack of respect for societal norms by his trial court antics.  In any event, such an argument has nothing to do with impeachment.

Regardless, as set forth above in the previous section, even assuming all reasonable counsel would have attempted impeachment by use of the criminal record, the legal prejudice from not placing Tereaun's criminal record before the jury was *de minimis*.  The state court's reasonable, possible determination of this claim when issuing the summary denial is AEDPA unassailable.  The claim should be denied.

G. Cumulative Error

There being no error found thus far, there can be no cumulative error claim that is meritorious.

*Conclusion*

Accordingly, IT IS HEREBY ORDERED that the request for an evidentiary hearing is denied.

IT IS HEREBY RECOMMENDED that

1.  The petition be denied; and

2.  The District Court decline to issue a certificate of appealability (COA).

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, petitioner may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  Petitioner is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 11, 2015

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE